UNITED STATES of America, Appellee,

v.

Cloyd J. HOLMES and Salvatore Frasca, Defendants–Appellants.

Nos. 121, 122, Dockets 93–1873, 93–1893.

United States Court of Appeals,
Second Circuit.

Argued Oct. 13, 1994.

Decided Jan. 23, 1995.

---

Patricia E. Notopoulos, Asst. U.S. Atty. for the E.D. of N.Y. (Zachary W. Carter, U.S. Atty.; Peter A. Norling, Asst. U.S. Atty., of counsel), for appellee.

Paul Greenfield, New York City for defendants Holmes and Frasca.

Before: OAKES, KEARSE, and PRATT, Circuit Judges.

PRATT, Circuit Judge:

Defendants appeal their convictions on charges relating to their embezzlement of welfare funds from Local 377 of United Services Employees Union. On appeal they raise numerous issues, including claims that (1) they were charged and convicted of several crimes that arose out of a single pattern of conduct; (2) the district court's charge to the jury on structuring financial transactions was defective under *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); (3) the district court refused to hear the full defense case; (4) they received ineffective assistance of counsel; and (5) the government improperly used an informant to obtain inculpatory statements from defen-

dant Holmes. Finding no merit in most of defendants' claims, we affirm in part, reverse and remand in part.

## BACKGROUND

From 1983 through 1992 defendant Cloyd Holmes, who was president of the United Services Employees Union Local 377 and a trustee of the union's welfare fund, and defendant Salvatore Frasca, who was secretary-treasurer of the union and administrator of the fund, embezzled several hundred thousand dollars from the union's benefit program. They embezzled the money through two fraudulent schemes for processing false and inflated medical claims.

The first scheme involved false claims for medical benefits. Defendants prepared and processed fictitious claims in the names of union members, but without the members' knowledge or consent. Then, when the checks were issued to pay benefits on the claims, they intercepted the checks, and defendant Holmes deposited them in his personal bank accounts. In the second scheme, defendants inflated the amounts of their personal and families' medical bills, and caused the inflated bills to be processed and paid by checks issued from the fund.

In October 1991 John Mazzella, a special agent of the Office of Labor Racketeering of the Department of Labor, and the Suffolk County District Attorney's Office began a joint investigation of defendants' activities. They had been alerted by Frasca's estranged wife to the defendants' embezzlement schemes. When the investigators discovered that the Suffolk County District Attorney's Office lacked jurisdiction, they turned the investigation over to the United States Attorney. Agent Mazzella continued on the investigation, and eventually interviewed Joyce Robidoux, a former union employee who processed medical claims for the fund. Robidoux provided information about the defendants' activities. Robidoux agreed to act as an informant for the government and to tape-record telephone conversations with Holmes.

In a sixteen-count indictment, Holmes was charged on fifteen counts and convicted on all of them: conspiring to embezzle union funds in violation of 18 U.S.C. §§ 371 and 664 (Count One); embezzlement of union funds in violation of 18 U.S.C. § 664 (Counts Two, Seven, and Eight); money laundering by concealing embezzled funds in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Four); money laundering by structuring financial transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(ii) (Count Five); witness tampering in violation of 18 U.S.C. § 1512(b)(1) (Count Nine); filing false Internal Revenue Service documents in violation of 18 U.S.C. § 1027 (Count Three); and other violations of the Internal Revenue Code, under 18 U.S.C. § 371 and 26 U.S.C. § 7206(1) (Counts Ten through Sixteen).

Frasca was charged in five of the sixteen counts, and convicted on four of them: filing false Internal Revenue Service documents in violation of 18 U.S.C. § 1027 (Count Three); conspiring to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371 (Count Ten); conspiring to embezzle union funds (Count 1); and embezzlement of union funds (Count 6).

The district judge sentenced Holmes to 97 months and Frasca to 57 months of imprisonment. Both were also sentenced to three years of supervised release and ordered jointly to pay $931,722 for restitution.

## DISCUSSION

I. *Multiplicity.*

Defendants claim that the indictment was multiplicitous. Specifically, they claim that the government has improperly multiplied the charges against them by accusing them in separate counts of embezzlement and money laundering by structuring and concealing financial transactions—all based upon a single scheme for embezzling the union funds. Relying principally on *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976), defendants argue that their embezzlements and subsequent laundering of the proceeds through structuring their bank deposits to avoid the IRS's reporting requirements, were all part of a single scheme that constituted a continuous, single offense.

A multiplicitous indictment, of course, is one that charges in separate counts

two or more crimes, when in fact and law, only one crime has been committed. *United States v. Nakashian,* 820 F.2d 549, 551 (2d Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987). The test for determining if a defendant has improperly been convicted under different statutes for a single transaction is whether congress intended to authorize separate punishments for the conduct in question. *See Whalen v. United States,* 445 U.S. 684, 688–89, 100 S.Ct. 1432, 1435–36, 63 L.Ed.2d 715 (1980); *Heflin v. United States,* 358 U.S. 415, 419–20, 79 S.Ct. 451, 453–54, 3 L.Ed.2d 407 (1959).

To the extent that defendants seek to link the embezzlements with the money laundering charges, their reliance on *Gaddis* is misplaced. In *Gaddis* the defendants were convicted of robbery; the court held that they could not also be convicted of receiving or possessing the robbery proceeds. The two offenses of robbery and possessing the proceeds of that robbery were viewed as part of one continuous transaction. Although a person who robs someone and takes their money has, through one sequence of events, violated two separate criminal statutes, *Gaddis* treated the offenses as a single punishable offense.

■ In contrast here, there is no inherent connection between the crime of embezzlement and the crimes of money laundering by structuring and concealing financial transactions; they are separate offenses and not part of one continuous offense. One may embezzle union funds without laundering the money or structuring financial transactions with it; one may also structure cash transactions or launder money without having acquired the funds through embezzlement.

■ Holmes contends, essentially, that even though embezzlement is a crime defined in a separate statute from money laundering and structuring, congress did not intend to impose multiple punishments, because the embezzled funds were also the subject of the laundering and structuring charges. We disagree. Congress has clearly signaled its intent to treat the money laundering and structuring as an offense separate from the underlying criminal conduct that generated the laundered or structured funds. It also in-

tended to impose separate punishments for these offenses. Senate Report 99–433 signals a congressional intent to enact a "new federal crime of money laundering at section 1956 of Title 18." S.REP. NO. 99–433, at 4. According to the report,

> Creation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes. * * * Unlike the existing provisions of the Bank Secrecy Act in Title 31, which deals with the problem of money laundering only indirectly, (by requiring the filing of various reports and punishing the failure to do so), the new section 1956 directly proscribes certain types of transactions used to launder the funds derived from illegal activity.

S.REP. NO. 99–433 at 9.

We agree with the tenth circuit, which concluded that congress's purpose in enacting the money laundering statute was to "provide a punishment in addition to other punishment[s]" that might be applicable to the underlying unlawful activity. *United States v. Edgmon,* 952 F.2d 1206, 1214 (10th Cir.1991). We therefore reject Holmes's contention that his embezzlement convictions could not be separate from the money laundering and structuring convictions.

We do find merit, however, in Holmes's claim of multiplicity as between the money laundering conviction under Count Four and the structuring conviction under Count Five. Count Four of the superseding indictment read:

*(Money Laundering—Concealment of Embezzled Funds )*

In or about and between November 1986 and August 20, 1992, both dates being approximate and inclusive, within the Eastern District of New York, the defendants CLOYD HOLMES and SALVATORE FRASCA, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct financial transactions which in fact

involved the proceeds of specified unlawful activity, to wit, violations of Title 18, United States Code, Section 664, *knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful criminal activity.* (emphasis added)

(Title 18, United States Code, Sections 1956(a)(1)(B)(i), 2 and 3551 *et seq.*)

Count Five of the indictment was entitled *"Money Laundering—Structured Financial Transactions"*. It reads identically with Count Four, except (1) it is brought against defendant Holmes alone, (2) in place of the language at the end that is underscored above, Count Five substitutes the following: "knowing that the transaction was designed in whole and in part to avoid the transaction reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder" and (3) Count Five cited § 1956(a)(1)(B)(ii) rather that § 1956(a)(1)(B)(i).

The underlying conduct referred to and proved at trial, was that Holmes took the embezzled money to the bank and engaged in "financial transactions", *i.e.*, deposited the money in the bank and later withdrew some of it. He did so in units of less than $10,000 in order to avoid the reporting requirements of Title 31 of the United States Code. The government, however, charged this misconduct both as money laundering in Count Four and as structuring financial transactions in Count Five. Both of these offenses are defined in 18 U.S.C. § 1956(a)(1)(B). In relevant part, that section reads:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

\*     \*     \*     \*     \*     \*

(B) knowing that the transaction is designed in whole or in part—

  (i) to conceal or disguise the nature, the location, the source, the ownership, or

the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be [guilty of a crime].

The conduct that is prohibited by this statutory provision is conducting a financial transaction for certain specified unlawful purposes. That conduct is criminal only if the defendant knows certain things at the time of the transaction. First, the defendant must know that the transaction represents the proceeds of unlawful activity. In addition, and critical to this case, the defendant must know that the transaction is designed to achieve either of two specified purposes: Subparagraph (B)(i) describes the first purpose, money laundering, which in effect is concealing the proceeds of the unlawful activity. Subparagraph (B)(ii) describes the second purpose, structuring, which is avoiding a reporting requirement.

■ We cannot accept the government's implicit contention that the same financial transaction gives rise to two separate crimes simply because the defendant, at the time he deposited the money, knew that what he was doing—the prohibited conduct—was designed for two unlawful purposes: concealing proceeds *and* avoiding reporting requirements. The statute punishes the conducting of a financial transaction with guilty knowledge. Having knowledge of two improper purposes rather than one does not multiply the offense of a single financial transaction into two offenses.

In the previous paragraph we note that this is only an implicit argument by the government. Its brief has not addressed this problem in any way, but has instead relied upon the contrast between the crime of embezzlement on the one hand, and the money laundering and structuring crimes, treated as a unit, on the other. Whether or not the government views a single financial transaction—here, a bank deposit or a withdrawal—as two crimes instead of one, we conclude that given the language of § 1956, congress must be deemed to have intended only a single punishment for each transaction even though the defendant may have had two

improper purposes in mind. While the proof at trial showed more than one bank deposit and withdrawal by Holmes—*i.e.*, more than one transaction—the government made no effort to sort the individual transactions into one category or the other, and the case was given to the jury on a basis that treated the bank deposits and withdrawals as a group.

■ We have concluded that defendant Holmes should not have been convicted and sentenced based on both Counts Four and Five. A remaining question is what relief should be granted at this stage. In *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), the Supreme Court answered this question in the context of a case where defendant had been convicted of both receiving a firearm and possessing it. After concluding that congress did not intend punishment under both provisions, the Court found that while the government might properly seek a multiple count indictment for the alleged violations, nevertheless, when the jury returns guilty verdicts for each count,

> the only remedy consistent with the congressional intent is for the District Court, where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions. * * * We emphasize that while the Government may seek a multiple-count indictment against a felon for violations of §§ 922(h) and 1202(a) involving the same weapon where a single act establishes the receipt and possession, the accused may not suffer two convictions or sentences on that indictment. * * * Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses.

*Ball,* 470 U.S. at 864–65, 105 S.Ct. at 1673.

Since the same act—conducting a financial transaction—served as the basis for the convictions on both Counts Four and Five, differentiated only by the knowledge possessed by the defendant when committing that act, we think the Supreme Court's instructions in *Ball* must be applied here as well. We therefore will remand the case against Holmes to the district judge with instructions to vacate the conviction on Count Five (structuring financial transactions) and to dismiss

that count of the indictment. The district judge should also, upon notice to the parties, reconsider the sentencing of defendant Holmes to determine whether the removal of Count Five from the group of convictions should have any impact upon the sentence imposed on defendant Holmes.

## II. *Jury Charge on Structuring.*

Holmes also contends that the district court's charge to the jury on Count Five—structuring financial transactions—was defective, because the court did not include the requirement of a knowing and willful violation that has been established for structuring charges under 31 U.S.C. § 5313(a). *See Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 655. Since we are directing that Holmes's structuring conviction under Count Five be vacated, we find it unnecessary to consider whether the jury charge on Count Five was improper.

## III. *District Court's Refusal to Hear Defense's Entire Case*

Both defendants contend that the district court refused to hear their whole case and thereby violated their fifth, sixth, and fourteenth amendment rights to due process and trial by jury. Specifically, they complain that the district court (1) limited the number of witnesses Holmes's attorney was allowed to call and (2) restricted counsel's examination of Mazzella.

### (1) *Limitation on the Number of Witnesses*

After Holmes's counsel had examined eight witnesses on his defense case, the court inquired how many more witnesses he planned to call. Counsel said he planned to call twelve or fifteen more witnesses. The court told him to choose his best witnesses and "[p]are it down".

Ultimately, the judge permitted counsel to call eight more witnesses, but declined to hear five others. Three of the five were to testify that Holmes had cashed checks for them and had managed their money because they were unable to control their own funds. The other two, relatives of Holmes, were to

testify that Holmes had received or inherited about $150,000 from family members. Defendants argue that their witnesses were prevented from testifying about "substantive things that have been raised by Miss Robidoux as far as the members were concerned."

■ While "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense", *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), this right does not preclude a judge from placing reasonable restrictions on the admission of evidence based on the concerns as to "prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence. *Id.; see also United States v. Edwards,* 631 F.2d 1049, 1051 (2d Cir.1980) ("district court has broad discretion to exclude evidence that is irrelevant or cumulative"); *United States v. Rahme,* 813 F.2d 31, 37 (2d Cir.1987) ("[t]he permissible scope and extent of cross-examination lie within the discretion of the trial judge").

■ We see no abuse of discretion in the trial court's excluding Holmes's additional witnesses. As to three of the witnesses, the government objected on relevancy grounds, arguing that their testimony would explain neither the depositing into Holmes's personal bank accounts of any checks that the government claimed were fraudulently issued nor the disposition of funds related to those checks. When the court inquired as to the relevance of the witnesses' testimony, Holmes's counsel responded that it was offered to prove that the cash withdrawals that the government claimed constituted the structured withdrawals of the embezzled money could have been the withdrawal of the three witnesses' money. However, when the court inquired whether the witnesses would testify to specific transactions within the relevant time frame or to the specific dates that they had received money from Holmes, counsel responded that "[t]hey could not testify [as to] a particular date". Absent some con-

nection between the testimony and the transactions at issue in this case, there was no abuse of discretion in excluding the testimony.

■ The court also properly excluded the testimony of the other two witnesses, the two relatives who would testify that Holmes had inherited about $150,000 from another relative. Counsel explained that the purpose of the testimony was to show that Holmes was not in need of financial assistance and thus, had no motive to commit the crime. However, one of the gifts was received 2–4 years before the alleged crimes began, and the other was 11–12 years before so the court ruled that this was too remote. We find no reversible error here, either.

(2) *Limitation of Mazzella's Examination.*

During trial, the defense called Agent Mazzella, who testified that he had suggested to Robidoux that she tape-record telephone conversations with Holmes. On direct, Mazzella confirmed that he knew the defendants were targets of a criminal investigation, that subpoenas had already been issued seeking documents from the union in connection with the investigation that led to this trial, that he was aware that there was a motion to quash the subpoena, and that he had seen the papers for the motion. When counsel asked if Mazzella knew whether the defendants' motion to quash was made *pro se* or through counsel, the district court sustained the government's objection and asked, "What does this line of questioning have to do with anything?" When Holmes's counsel started to answer, "Judge if they were represented by counsel at that time * * *", the court interrupted and prohibited counsel from continuing this line of questioning. Defendants now contend that further questioning would have revealed that Mazzella intentionally violated their fifth and sixth amendment rights by seeking to obtain incriminating evidence from Holmes when Holmes was a target of a criminal investigation and was represented by counsel.

Defendants also argue that further cross-examination would have demonstrated Maz-

zella's bias. Defendants contend that Mazzella's credibility was fundamental to the prosecution's case and that attacking his credibility was important to the defense's case.

■ The sixth amendment guarantees an accused the right to confront and cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). An accused may cross-examine a witness to reveal possible biases, prejudices, or motives. *Id.* at 316, 94 S.Ct. at 1110 ("partiality of a witness is subject to exploration at trial and is 'always relevant as discrediting the witness and affecting the weight of his testimony'"). However, it is the "trial judge [who] is in the best position to weigh competing interests in deciding whether or not to admit certain evidence", and "[a]bsent an abuse of discretion, the decision of the trial judge to admit or reject evidence will not be overturned by an appellate court." *United States v. Moon*, 718 F.2d 1210, 1232 (2d Cir.1983).

■ In this case, the trial court's limitation of Agent Mazzella's examination was within its discretion. The subpoenas had been issued for documents of the union. Nothing showed that Holmes, individually, had any direct involvement in the motion to quash. Thus, further inquiry of Agent Mazzella about the motion was irrelevant. To the extent that Holmes claims that the inquiry could have undermined Mazzella's credibility, this claim is speculative, for there is no necessary connection between Holmes' being represented by counsel and either the union's motion to quash or the fact that the union had to be represented by counsel on the motion. Moreover, as discussed in detail later, in this opinion, Holmes's right to counsel did not attach until later, when specific charges were filed against him. In short, there was no abuse of discretion in the district court's decision to preclude further examination of Mazzella on this point.

IV. *Ineffective Assistance of Counsel.*

■ Defendants contend that they did not receive the effective assistance of counsel that is guaranteed them by the sixth amendment. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant who claims ineffective assistance of counsel, must establish, first, that counsel's representation "fell below an objective standard of reasonableness * * * under prevailing professional norms", *id.* at 688, 104 S.Ct. at 2064–65 and second, that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

■ Holmes contends that his counsel's conduct was not reasonably competent because he failed to object or except to the court's ruling that limited the number of defense witnesses and he thereby failed to preserve the issue for appellate review. As we have seen, however, the court's exclusion of the five witnesses' testimony was not erroneous. Holmes also mentions other, unspecified "shortcomings by counsel". However, Holmes cannot satisfy either prong of the *Strickland* test without specifying what the "shortcomings" are so that the court can determine whether counsel's performance was inadequate and if so, whether the result would, indeed, have been different.

Frasca, too, contends that his counsel's conduct fell below "reasonable competence". He defines counsel's failures as not being properly prepared, not having a direct case or strategy, and not cross-examining in an appropriate manner. Even though Frasca is more specific than Holmes, he still does not focus sufficiently on counsel's failures to permit a court to apply *Strickland*'s second prong—whether "but for" counsel's conduct, there would have been a different outcome.

■ Frasca also contends that counsel failed him ·by not moving for a severance. However, rarely should such motions be granted; even more rarely are convictions reversed when severance motions have been denied. *Zafiro v. United States*, —— U.S. ——, ——–——, 113 S.Ct. 933, 937–38, 122 L.Ed.2d 317 (1993). Moreover, even if Frasca's attorney had moved for a severance, there is no way to know whether it would have been granted, and even assuming it would have been granted, there is no way to establish that the result of the trial would have been different. In short, on this record

there simply is no way that Frasca can obtain a reversal based on his counsel's claimed ineffectiveness in failing to seek a severance.

## V. *Government's Use of an Informant*

Defendant Holmes contends that his fifth and sixth amendment privileges against self-incrimination and right to counsel were violated by the government's use of Joyce Robidoux, a former clerk who agreed to tape-record her conversations with Holmes. The defendant claims that through Robidoux, the government deliberately elicited statements against his penal interest at a time when it knew (1) that the Nassau County District Attorney was investigating him, and (2) that counsel was representing Holmes in resisting subpoenas issued in connection with the investigation of the matters that eventually led to the indictment in this case.

Preliminarily, Holmes's claim is not properly before us, because Holmes's counsel did not move to suppress the tape-recorded conversations before trial. *See United States v. Ulloa,* 882 F.2d 41, 43 (2d Cir.1989) (under Federal Rules of Criminal Procedure, a motion to suppress evidence must be made prior to trial and failure to make the motion is equivalent to waiver); *United States v. Rollins,* 522 F.2d 160, 165 (1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976).

Even if we were to entertain Holmes's argument on its merits, however, we would reject it because, at the time, Holmes's conversations with Robidoux were not protected by either the fifth amendment's privilege against self-incrimination or the sixth amendment right to counsel. As to the fifth amendment, in *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), an undercover officer, disguised as a fellow cellmate, was not compelled to give *Miranda* warnings to an imprisoned defendant prior to asking questions that could elicit incriminating statements. The Court reasoned that the suspect's fifth amendment privilege against self-incrimination was not violated, because when the accused made incriminating statements there was no danger of coercion or compulsion, nor was there a "police-dominated atmosphere." *Id.* at 296, 110

S.Ct. at 2397 (internal quotes omitted). The court further explained that statements that are the result of "[p]loys to mislead a suspect or lull him into a false sense of security" are admissible into evidence as long as they "do not rise to the level of compulsion or coercion". *Id.* at 297, 110 S.Ct. at 2397.

■ At the time of his conversations with Robidoux, Holmes was neither in the custody of the police nor being subjected to an "interrogation", defined as "questioning initiated by law enforcement officers after a person has been taken into custody". *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). He was a free citizen and was unaware of the investigation; he was never placed in a position that required him to decide whether to waive his right to an attorney or choose to communicate with the government solely through counsel; he did not even know that Robidoux was a cooperating government agent.

Thus, his discussions with Robidoux did not generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467, 86 S.Ct. at 1624. In short, Holmes was entitled to no fifth amendment protection for his conversations with Robidoux.

Holmes also argues that his sixth amendment rights were violated because the government knew that he was represented by counsel and intentionally interrogated him through Robidoux without presence of counsel. Holmes relies primarily on the Supreme Court's decision in *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), where the state had used an undercover agent to record conversations between the defendant and the agent. There, the Court held, the defendant's sixth amendment rights were violated, because the state had knowingly exploited the opportunity to confront the accused without presence of counsel. *Id.* at 176, 106 S.Ct. at 487.

■ However, in *Moulton,* the state used the agent *after* the defendant had already been criminally charged. *Id.* at 162–63, 106 S.Ct. at 480. In this case, by contrast, the

**1160**

government employed Robidoux *before* Holmes was charged; thus, no sixth amendment violation occurred. During the investigation of an unindicted target, sixth amendment rights do not attach until "the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972); *see also In re Grand Jury Subpoena Served Upon Doe,* 781 F.2d 238, 244 (2d Cir.), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). Because there were no charges pending against Holmes when the government used Robidoux, and adversarial proceedings had not been initiated against him, there was no interference with Holmes's right to counsel. Thus, Holmes's reliance on *Moulton* is misplaced.

Moreover, although Agent Mazzella knew that counsel for the *union* had moved to quash the subpoenas for its records, there is nothing in the record to show that Holmes and Frasca, individually, were represented by counsel at the time of the conversations. Mazzella, himself, denied any knowledge that the defendants were then represented by counsel, and he was not required to presume that the same attorneys that represented the union, the party whose funds were being unlawfully taken, were also representing Holmes and Frasca, the very people suspected of taking those funds.

In sum, defendants' challenges to the recordings of the Robidoux conversations also fail.

### CONCLUSION

We affirm the conviction and sentence as to defendant Frasca. As to defendant Holmes, we affirm on all counts except Count Five which we reverse. We remand the sentence to the district court with instructions to determine whether vacating the conviction on Count Five should have any effect on the overall sentence.