INTERNATIONAL MINERALS AND RE-SOURCES, S.A. and International Shipping Company, S.A., Plaintiffs–Counter-defendants–Appellants–Cross Appellees,

and

Lygren Maritime Services, S.A., Plaintiff–Counterdefendant,

v.

T. Peter PAPPAS, American General Resources, Inc. and A.L. Burbank Shipbrokers, Ltd., Defendants–Appellees,

and

Richard Jaross, Defendant–Counterclaimant–Appellee,

and

BOMAR RESOURCES, INC., Defendant–Appellee–Cross Appellant,

v.

Atle LYGREN, Additional Defendant on Counterclaim.

Nos. 931, 1053, Dockets 95–7328, 95–7732.

United States Court of Appeals, Second Circuit.

Argued Feb. 1, 1996.

Decided Sept. 6, 1996.

---

588

Elliot Silverman, Gold & Wachtel, L.L.P., New York City (Robert Gold, of counsel) for Plaintiffs–Counterdefendants–Appellants–Cross Appellees.

Howard B. Sirota, Sirota & Sirota, New York City, for Defendant–Appellee–Cross Appellant.

John H. Doyle, III, Anderson Kill Olick & Oshinsky, P.C., New York City (Lisa M. Anastos, of counsel) for Defendant–Appellee Pappas.

Joseph D. Pizzurro, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for Defendant–Appellee A.L. Burbank Shipbrokers.

Barry Golomb, Rivelis, Pawa & Blum, New York City, for Defendant–Counterclaimant–Appellee.

Robert E. Juceam, Fried, Frank, Harris, Shriver & Jacobson, New York City (Jack B. Gordon, of counsel) for amicus curiae The Baltic Exchange Limited.

Before: OAKES, WINTER, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

This is an appeal by plaintiffs from certain orders and a grant of summary judgment in favor of defendants by the United States District Court for the Southern District of New York (Peter K. Leisure, *District Judge* ) (orders) and (Harold Baer, Jr. *District Judge* ) (summary judgment). Disappointed when the Brazilian Friendship, a vessel they believed they had contracted to buy, was sold to defendant T. Peter Pappas, plaintiffs sued Pappas and others for tortious interference with contract. Plaintiffs allege that the district court erred when it (1) applied New York, rather than English, contract formation law; (2) concluded that under New York law, summary judgment was appropriate; (3) instructed the jury that defendants' post-May 28, 1987 conduct was not actionable under a tortious interference with contract theory; (4) instructed the jury that defendant Pappas was not obligated to obey an injunction issued by an English court; (5) excluded certain evidence as to damages; and (6) misinstructed the jury with respect to the damages issue.

Defendant Bomar Resources, Inc. ("Bomar") cross-appeals on the grounds that the evidence was insufficient to support a verdict against it and that the district court gave an erroneous jury instruction on the issue of the vicarious liability of Bomar for the acts of defendant Richard Jaross. Bomar claims that Jaross did not act as Bomar's agent with respect to the Brazilian Friendship and that Bomar cannot therefore be found vicariously liable for Jaross's conduct.

For the reasons that follow, we affirm the judgment of the district court in part, vacate in part, and remand the case for a new trial.

## BACKGROUND

The circumstances of this case center around the attempts by various parties, their brokers, and others to purchase a vessel, the Brazilian Friendship, which was in a distressed condition after running aground in the Orinoco River in Venezuela in November 1985. The facts are set forth in detail in the opinion of the district court, reported at *International Minerals & Resources, Inc. v. Pappas,* 761 F.Supp. 1068 (S.D.N.Y.1991), familiarity with which is presumed. We summarize the principal facts pertinent to this appeal.

### A. The Parties

Plaintiff International Minerals Resources, Inc. ("IMR") is a Liberian corporation formed at the request of an individual named Atle Lygren. Plaintiff International Shipping Company, S.A. ("ISC") is a Panamanian company that is wholly owned by IMR and was acquired for the purpose of taking title to the Brazilian Friendship. Plaintiff Lygren Maritime Services, S.A. ("LMS") is a shipbrokerage firm of which Lygren owns seventy percent and Nicholas Reisini owns thirty percent.

Defendant Bomar, a New York corporation based in New Jersey, trades in distressed vessels. Defendant American General Resources, Inc. ("AGR") is a Texas corporation engaged in the business of buying, selling, salvaging, repairing, and scrapping vessels. Defendant Jaross, a United States citizen and Connecticut resident, is the vice president and treasurer of AGR. Defendant A.L. Burbank Shipbrokers, Ltd. ("Burbank") is a Delaware shipbrokerage firm with its principal place of business in New Jersey. Terry Chance is one of Burbank's brokers. Burbank frequently has acted as broker for AGR and Bomar in ship acquisitions. Defendant Pappas, a United States citizen and Connecticut resident, is a substantial shipowner and, at least prior to this action, was a close friend of Lygren.

### B. Factual Background

In November 1985, the Brazilian Friendship ran aground in the Orinoco River with a

cargo of approximately 64,000 tons of iron ore. The vessel was severely damaged but was the subject of considerable international interest by those involved in the purchase and sale of distressed vessels. Title to the vessel was not clear until April 1987 when it passed to a local salvage company in Venezuela, which nominated Hydra Offshore, Ltd. ("Hydra") to take title to the vessel. Hydra's principal is Carla de Calderan, its brokerage firm is English White Shipping ("EWS"), and its law firm is Holman Fenwick & Willan ("HFW"). Paul Messenger is an EWS broker.

In May 1986, Lygren asked Pappas if he was interested in buying the Brazilian Friendship. Pappas told Lygren that he was not. Later in 1986, Lygren spoke with Jaross about a possible purchase of the vessel. Lygren suggested that Bomar, AGR, and Lygren enter into a joint venture to purchase the Brazilian Friendship, but Jaross rejected the proposal. By this time, AGR had entered into a written agreement with Bomar under which AGR would act as Bomar's agent in finding scrap vessels or distressed vessels suitable for scrapping.

By early 1987, Lygren decided that his company IMR, acting alone, would purchase the Brazilian Friendship. For several months, Lygren and Messenger of EWS, acting on behalf of Hydra, engaged in negotiations for the sale of the vessel to Lygren. On April 23, 1987, Messenger sent Lygren a telex, captioned "summary of agreement," that purported to set forth the result of the negotiations up to that time. The telex set forth a purchase price of $2.65 million and provided that the agreement was subject to the approval of the buyer's board of directors by close of business on May 11, 1987, and to the signing of a formal Memorandum of Agreement ("MOA"). This deadline was subsequently extended to May 15, 1987. On May 15, the condition of board approval was lifted. On May 19, IMR appointed ISC as its nominee to purchase the vessel.

On May 17, having learned of ISC's plan to purchase the vessel, Jaross contacted Lygren by telex to express that he was "shocked to learn" about the plan. Lygren's reply telex denied that Lygren and Reisini had purchased the vessel. The telex stated: "Pls note that Nicholas and I did not and have not bought the vessel. Your conversation with Nicholas is based on a misunderstanding as he was not uptodate on exactly what was going on." On May 18, Jaross instructed Burbank's Chance to bid $2.8 million for the Brazilian Friendship; Burbank telexed this offer to EWS, Hydra's representative. EWS replied with a telex stating: "tks tlx but would confirm vsl now def sold." On May 22, Burbank telexed EWS again, offering to pay $2.8 million if the vessel were, or were to become, free. On May 24, Burbank boosted its offer. Chance sent a bid to EWS, with a copy directly to Hydra's Calderan in Venezuela, offering to buy the Brazilian Friendship for $2.925 million.

On May 25, 1987, ISC and Hydra signed a formal MOA, as contemplated by the April 23 telex, covering ISC's purchase of the Brazilian Friendship from Hydra for $2.65 million. The MOA was dated May 15, 1987.

On May 26, EWS responded to Chance's May 22 bid by telex, stating: "vessel still not workable but will advise immy any opportunity to cut in." Chance then sent a bid for $2.95 million, and draft MOA, to Calderan only. On May 27, Calderan, via telex, attempted to void the contract with ISC. On May 28, 1987, Hydra cancelled the MOA—just three days after it was signed.

ISC immediately commenced an arbitration proceeding in London, seeking specific performance of the contract. On June 1, the High Court of Justice, Queen's Bench Division, issued an injunction barring Hydra from selling the Brazilian Friendship to anyone other than plaintiffs.

On June 2, 1987, at a closing in Florida, Pappas purchased the Brazilian Friendship from Hydra at a price of $2.95 million. According to the allegations in the complaint, the closing documents were backdated to May 29 to avoid the reach of the injunction.

## C. Proceedings in the District Court

On June 9, 1987, ISC and LMS sued Hydra, Pappas, Jaross, AGR, and several other defendants in the Southern District of New York on a variety of theories. Judge Leisure

dismissed the action for lack of diversity jurisdiction because both plaintiffs were aliens and Hydra was an alien defendant, and awarded Rule 11 sanctions against plaintiffs' then-counsel. *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 675 F.Supp. 146 (S.D.N.Y.1987). We affirmed. *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). Plaintiffs, via new counsel, then moved for leave to amend their complaint. Judge Leisure granted the motion. The amended complaint asserted a single cause of action by IMR, ISC, and LMS against Bomar, Pappas, AGR, Burbank, and Jaross for tortious interference with plaintiffs' contract with Hydra for the purchase of the Brazilian Friendship. The gravamen of the amended complaint was that defendants

intentionally and maliciously interfered with the contract between Hydra and [ISC] by (1) making, and causing to be made, bids for the Brazilian Friendship *after* they knew, or without reckless disregard of the true facts should have known, of the existence of a binding agreement between [ISC] and Hydra; (2) attempting to structure their purported purchase of the Brazilian Friendship so as to avoid liability to [ISC] and accountability to the British courts, which had restrained any sale or disposition of the Brazilian Friendship; and (3) inducing Hydra to deny plaintiffs their rightful interest in, and possession of, the Brazilian Friendship.

Defendants answered and defendant AGR asserted a counterclaim against plaintiffs and a cross-claim against Lygren, alleging that Lygren and his companies breached their fiduciary duty and engaged in self-dealing, thereby depriving AGR of the opportunity to profit from the resale of the vessel and her cargo. Defendants Jaross and AGR moved for summary judgment.

On April 19, 1991, Judge Leisure held that plaintiffs had no claim based on events occurring prior to May 25, 1987 (the date of the signing of the formal MOA between ISC and Hydra) but that plaintiffs IMR and ISC could proceed with their claim based on events occurring after May 25, 1987. *International Minerals & Resources, Inc. v. Pappas,* 761 F.Supp. 1068, 1075–77 (S.D.N.Y. 1991). On August 22, 1991, Judge Leisure denied plaintiffs' motion for reargument. No. 87 CIV. 3988(PKL), 1991 WL 167267 (S.D.N.Y. Aug. 22, 1991). Defendants Pappas and Burbank moved for summary judgment dismissing the claims against them. On November 17, 1992, Judge Leisure denied the motion.

The case subsequently was reassigned to Judge Baer who conducted a jury trial between February 1 and February 23, 1995. Before the case was submitted to the jury, Judge Baer ruled that defendants could not be found liable for any conduct occurring after May 28, 1987 (the date on which Hydra cancelled the MOA).

The jury, rendering its verdict in the form of answers to a series of interrogatories, found: (1) against defendants Jaross, AGR, and Bomar on the issue of tortious interference with contract, with compensatory damages in the amount of $1.2 million and no punitive damages; (2) in favor of defendants Pappas and Burbank on the issue of tortious interference with contract; and (3) in favor of Lygren with respect to AGR's counterclaim.[1]

Plaintiffs here seek a new trial on the liability issue with respect to Pappas and Burbank and a new trial on the damages issue as to all defendants. Defendant-cross-appellant Bomar seeks reversal of the judgment of the district court against Bomar.

## DISCUSSION

This case is factually complex and presents a tangle of legal issues. Unfortunately, the district court made several erroneous rulings quite early in the litigation that affected the proceedings thereafter. In the end, the jury was presented with the evidence but not the issues. This case must therefore be remanded in part so that a jury can determine: when, under English law, the parties entered into a valid contract; whether the plaintiffs are estopped from asserting the existence of

---

1. AGR has not appealed this ruling.

a contract prior to May 25, 1987; whether Pappas and/or Burbank tortiously interfered with plaintiffs' contract to purchase the Brazilian Friendship;[2] and, what damages, if any, are appropriate with respect to all defendants found liable. We affirm the judgment of the district court that held Bomar liable for tortious interference with contract.

## A. Summary Judgment Standard

It is well-settled that in ruling on a motion for summary judgment,

[a] judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). *See also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). Furthermore, a district judge must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996). When reviewing the grant of a summary judgment motion, we must determine whether there are any genuine factual issues, material to the outcome, that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

## B. Choice of Laws

The first issue we face is whether the district court erred in applying New York contract formation law in determining when a valid contract existed between ISC and Hydra. Plaintiffs argue that English contract formation law governs. Defendants maintain that New York contract formation

law controls but that in any event, even under English law, no contract existed prior to May 25, 1987, the date on which ISC and Hydra signed the MOA. The MOA expressly provided: "it is understood that arbitration will take place in London in accordance with English law" and that "[the] contract shall be subject to the law of the country agreed as place of arbitration."

It is undisputed that the parties validly selected England as the forum, and there is a "strong public policy in favor of forum selection and arbitration clauses." *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). *See also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, —— U.S. ——, ——, 115 S.Ct. 2322, 2328, 132 L.Ed.2d 462 (1995) (discussing "contemporary principles of international comity and commercial practice" and indicating that "the courts of this country" should not "disparage the authority or competence of international forums for dispute resolution"). In addition, the parties incorporated the forum selection clause in their choice of law provision. As has been noted, "New York law is unambiguous in the area of express choice of law provisions in a contract.... '[A]bsent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction.'" *Klitzman v. Bache Halsey Stuart Shields, Inc.*, No. 79 CIV. 6249(JFK), 1985 WL 1984 (S.D.N.Y. June 27, 1985) (quoting *Hawes Office Sys., Inc. v. Wang Labs., Inc.*, 537 F.Supp. 939 (E.D.N.Y. 1982)). England's sufficient contacts with the transaction—its status as the forum of choice together with the activities of the seller's London brokers—rendered English law applicable to the contract formation issue. Accordingly, the district court erred in relying on New York contract formation law.

We must, however, consider whether the application of New York law, while erroneous, was harmless—in other words, whether there was, under the circumstances, an actual conflict of laws. This is so because al-

---

**2.** Because AGR and Jaross have not appealed, we are without jurisdiction to review the jury's

finding that they were liable for tortious interference with contract.

though plaintiffs assert that under English law, a contract existed as of April 23, 1987, defendants claim that even under English law, a contract did not exist until May 25, 1987,[3] the date they say contract formation occurred under New York law.

 Under both New York and English law, a contract is formed when all of the contracting parties express an intent to be bound and where all of the essential terms of the agreement have been spelled out. *See Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568, 574 (2d Cir.1993) ("Simply because the parties contemplate memorializing their agreement in a formal document does not prevent their agreement from coming into effect before written documents are drawn up. That is, if the parties have settled on the contract's substantial terms, a binding contract will have been created, even though they also intended to memorialize it in a writing.") (citations omitted); *Ateni Maritime Corp. v. Great Marine Ltd.,* 2 Lloyd's Report 250, 254 (Q.B.1990) ("The fact that the terms of the standard form memorandum of agreement were incorporated into the contract did not prevent a binding agreement being reached, notwithstanding the fact that it was anticipated that the concluded contract would be drawn up and the standard terms amended so as to reflect the specific terms that had been agreed between the parties. The alterations subsequently made were undertaken merely to give effect (by amendment of the form agreed to be used) to the specific terms agreed between the parties, and to give effect to minor variations agreed between them after the date of the recap telex message.... [T]he signing of the memorandum of agreement ... was not a condition precedent to the contract.").[4] Therefore, the application of New York contract formation law, although erroneous, was harmless. However, it also seems clear that the issue of whether (and when) the parties intended to be bound is a factual issue that

should have been submitted to the jury. Therefore, the district court erred in granting summary judgment that prevented plaintiffs from arguing that there was a contract prior to the May 25 signing of the MOA. As we noted in *Consarc,* there is

an array of factors for the factfinder to consider in determining whether parties intend to be bound absent a writing.... [S]ome of the most common factors relied on in determining intent include: (1) number of terms agreed upon compared to total number to be included, (2) relationship of the parties, (3) degree of formality attending similar contracts, (4) acts of partial performance by one party accepted by the other, (5) usage and custom of the industry, (6) subsequent conduct and interpretation by the parties themselves, (7) whether writing is contemplated merely as a 'memorial,' (8) whether contract needs a formal writing for its full expression, (9) whether any terms remain to be negotiated, (10) whether contract has few or many details, (11) whether amount involved is large or small, (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract ... (13) the speed with which the transaction must be concluded, (14) the simplicity or complexity of the transaction, (15) the availability of information necessary to decide whether to enter into a contract, and (16) the time when the contract was entered into.

996 F.2d at 575–76. On retrial, resolution of the factual issues should be left to the jury to decide under English contract formation law.

 In addition, it was error for the district court to hold, as a matter of law, that even if a binding contract did exist before May 25, plaintiffs were equitably estopped from asserting its existence. This holding was based on Lygren's telex of May 18 to Jaross, which stated that Lygren and Reisini

---

**3.** Defendants also claim that plaintiffs waived the right to raise the issue of the applicability of English law. We reject this argument. Plaintiffs expressly preserved their right to raise this issue by expressly stating in their request to charge that they did not intend to waive this right.

**4.** Plaintiffs note that under English law, the same contract may be subject to "successive breaches," each of which is independently actionable. Therefore, if English law of contract formation/breach is applied, New York tortious interference with contract law would require the jury to consider post-May 28 conduct.

had not purchased the Brazilian Friendship. Under New York law, " '[t]he elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position.' " *Smith v. Smith,* 830 F.2d 11, 12 (2d Cir.1987) (quoting *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 81–82, 430 N.Y.S.2d 179, 187 (1980)). *See also Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301–02 (2d Cir. 1996). This issue should have gone to the jury because most, if not all, of these elements presented contested issues of fact.

The conclusions reached by the jury with respect to the foregoing issues (the existence and timing of any ISC–Hydra contract and whether plaintiffs are estopped) will necessarily determine whether remaining issues will be implicated. Because on retrial they are likely to recur, we discuss briefly (in Sections D, E, and F) the remaining issues for the district court's benefit. However, we first consider Bomar's claim that the district court issued an erroneous charge and that therefore judgment against Bomar should be reversed.

## C. Bomar's Agency Law Argument

Bomar argues that the district court's charge on agency erroneously permitted the jury to conclude that Jaross was Bomar's agent notwithstanding that Jaross's interest in purchasing the Brazilian Friendship himself was adverse to that of Bomar.

The district court instructed the jury as follows:

> Plaintiffs claim that Bomar's interference with the contract was through its agent Jaross. Bomar claims that Jaross ceased acting as their agent on May 24, 1987. You must determine who acted as an agent for which principal, at what times. Again, the simple rule is this: Principals know everything their agents

know, but agents do not know everything their principals know.

Just to complicate that issue a little, there is a theory called apparent authority, which you ought to know about.

If plaintiffs cannot demonstrate by a preponderance of the evidence that Jaross was an agent of Bomar after May 24, 1987, Bomar may still be liable if Jaross had apparent authority to act for Bomar. An agent has apparent authority when from the point of view of a third person the transaction appears regular on its face and the agent appears to be acting in the ordinary course of business confided to him or her. However, Bomar is not liable for Jaross'[s] actions outside his authority unless plaintiffs have proven that plaintiffs or Hydra reasonably relied upon Jaross'[s] acts based upon some misleading conduct by Bomar.

Bomar argues that the jury could find from the evidence at trial that Jaross had an interest adverse to Bomar and therefore did not act as Bomar's agent with respect to the purchase of the Brazilian Friendship, particularly after May 22, but that the charge was insufficient because the judge did not instruct the jury that Jaross's knowledge should not be imputed to Bomar if Jaross had such an adverse interest. Bomar notes that Jaross's testimony was contradictory: at different times, he claimed that he sought to purchase the vessel for himself, for AGR, for AGR's nominee, for Bomar, and for Pappas. Bomar also points to the fact that Jaross never claimed to receive any compensation from Bomar for his services allegedly rendered in connection with the purchase of the vessel.

■ We find that although the charge did not use the "adverse interest" language and would have been better if it had, it nevertheless permitted the jury to reach the conclusion sought by Bomar when it required, before apparent authority could be found, that the transaction appear regular on its face and that the "agent appear[ ] to be acting in the ordinary course of business confided to him or her."

■ Bomar also contends that the jury should have been instructed as to the status of Jaross/AGR as an independent contractor and that under New York law, employers generally are not liable for the torts of independent contractors. Bomar preserved its right to raise this issue on appeal because it had requested a jury instruction regarding Jaross's status as an independent contractor. Again, although the court erred in not giving the requested instruction, Bomar was not substantially prejudiced by the district judge's failure to give an independent contractor instruction in light of the instruction he did give. Accordingly, we affirm the district court's finding of Bomar's liability for tortious interference with contract.

### D. Tortious Interference with Contract under New York Law

■ Although the parties disagree on whether the law of England or of New York should apply to contract formation, they agree that the claim of tortious interference with contract is governed by New York law. "To maintain a successful cause of action for tortious interference with contract under New York law, a plaintiff must allege and prove the existence of a valid contract and damages caused by the defendant's knowing and intentional interference with that contract without reasonable justification." *Jews for Jesus, Inc. v. Jewish Community Relations Council,* 968 F.2d 286, 292 (2d Cir. 1992). *See also Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993) (listing four elements: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff"). To determine whether interference with a contract was justified, the New York courts have adopted an approach that

> requires a balancing of factors to determine whether the interference was justified under the circumstances of the particular case. These factors include: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant inter-

feres, the interests the defendant seeks to advance, the social interests at stake, the proximity of the defendant's conduct to the interference, and the relations between the parties.

*Jews for Jesus,* 968 F.2d at 292.

The jury found that defendants AGR, Jaross, and Bomar had tortiously interfered with plaintiffs' contract with Hydra and that AGR and Jaross had acted maliciously, wantonly, or with reckless disregard of plaintiffs' rights.

Of course, we cannot predict whether a jury on retrial will find that Pappas and/or Burbank tortiously interfered with plaintiffs' contract to purchase the Brazilian Friendship. The answer necessarily will depend on the jury's conclusions as to the existence and timing of a valid contract (because that will determine which events the jury may take into consideration), as to when the defendants learned of the existence of any such contract, and as to whether the plaintiffs are equitably estopped. It will also depend on how the issue of the English injunction, to which we turn next, is resolved.

### E. The English Injunction

■ By focusing the jury's attention on the May 25–28 period, the district court effectively excluded from jury consideration the injunction issued by the High Court of Justice in England and the consequences of that injunction. We believe that the district court erred in doing so. Defendants maintain that the jury in fact was permitted to consider events that occurred prior to and subsequent to this time period, including the injunction. Defendants are only partially correct. Although the district judge instructed the jury that it could consider such events, he expressly instructed the jury to consider them solely in evaluating the defendants' state of mind and not on the question of tortious interference with contract. Plaintiffs correctly point out that absent this limiting instruction, for which we believe there to have been no legal justification, the jury might have reached different liability determinations. For example, the jury could have found against Pappas on the tortious inter-

ference claim if it concluded that he moved the Brazilian Friendship closing to Florida to interfere with plaintiffs' contract to purchase the vessel, i.e., by avoiding the English court's injunction. Moreover, the district judge specifically, and we believe erroneously, instructed the jury that the "injunction had no legal effect whatsoever on the issues you are being asked to consider." The injunction would be highly relevant if, for example, the contract was found to be ongoing or if Hydra's unilateral cancellation of the MOA was found to be ineffective. The injunction certainly would be relevant to the defendants' states of mind on the tortious interference claim if the contract was still alive after May 28.

### F. Damages

Plaintiffs claim that the district court erred in refusing to admit into evidence letters dated February 25, 1988 and March 9, 1989, which indicated that had plaintiffs been able to purchase the Brazilian Friendship, they would not have resold it until July 1989, and that they had made the decision regarding the timing of resale in advance of a significant change in the market. Plaintiffs claim that the letters represented the sum total of their corroborating evidence as to their intent to operate the vessel in the charter market until July 1989. Defendants claim that evidence to this effect was before the jury, in the form of testimony by Lygren and by an expert witness, Gunther Ose.

· ■ A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record. *See* Fed. R.Evid. 403; *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir.1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."). Although the district court properly could have received the letters proffered by the plaintiffs, there was no abuse of discretion by the district court in refusing to admit them because evidence regarding the timing of any resale that might have occurred was already before the jury. The district court did not err in implicitly concluding that the letters sought to be admitted would have been unnecessarily repetitive.

Plaintiffs also argue that the district court issued erroneous jury instructions with respect to damages. Plaintiffs' theory of damages was that plaintiffs would have swapped the cargo of iron ore that was aboard the Brazilian Friendship for repair of the vessel by the Rumanians, would have operated the repaired vessel in the charter market for eighteen months, and would have sold the vessel in July 1989. Plaintiffs' expert witnesses estimated that plaintiffs would have earned in excess of $3 million from chartering the vessel, would have received $19 million on the resale, and would have netted a total profit in excess of $18 million. In contrast, defendants argued that the only fair measure of damages was the profit made by Pappas when he resold the Brazilian Friendship in February 1988. The jury agreed with defendants and awarded damages in the amount of $1.2 million.

The district judge instructed the jury as follows:

> Should you find that any of the defendants is liable for causing a breach of the plaintiffs' contract, they're entitled to damages representing the full pecuniary loss of the benefits of the contract. The full pecuniary loss, if any, to plaintiffs is the benefit plaintiffs could have gained had Hydra not repudiated the Memorandum of Agreement. It is their contention that this includes the income plaintiffs would have earned by chartering the Brazilian Friendship; and the profits they would have made at the time they would have resold the Brazilian Friendship. Defendants dispute this and contend that damages, if any, should only cover the cost to plaintiff of replacing the Brazilian Friendship. You may find one way or the other. That is, you may give damages for the replacement value on the one hand, or on the other hand, for the chartering and resale value. You may not find damages which include all three, that is, a replacement value, a charter profit and a resale value, since that would constitute a double recovery, which the law does not allow.

■ It is well-settled that, under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract, and that "the elements of damages, including consequential damages, [are] those recognized under the more liberal rules applicable to tort actions." *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 197 n. 6, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). With respect to damages,

> [o]ne who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

Restatement (Second) of Torts § 774A (1977).

> Stated differently, a
> plaintiff who establishes a valid tort claim for interference with contract ... may recover in an appropriate case: (1) general damages based on the difference between contract price and market value of the thing promised, where the interference prevents the performance of the thing promised; (2) special or consequential damages subject to the rules of proximate cause ... and subject also to the requirements of the reasonable certainty and avoidable consequences rules; (3) punitive damages where the defendant's conduct and state of mind warrant punishment; and (4) emotional distress damages in a limited class of cases.

2 Dan B. Dobbs, Law of Remedies: Damages–Equity–Restitution § 6.6(2), at 134 (2d ed. 1973). General damages are "normally ... measured by the difference between contract price and the value of the performance to be received." *Id.* at 134–35. Consequential damages include recovery for lost profits, which must be proven with reasonable certainty. *Id. See also International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 85–86 (2d Cir.1996) (per curiam).

■ It seems to us that, applying the above-mentioned principles, plaintiffs may only recover the chartering profits that would have accrued to the Brazilian Friendship until the plaintiffs would have sold it, plus the profit that would have been realized upon resale of the vessel. An award of damages in this amount would place plaintiffs in the same position as they would have been in had there been no breach of contract owing to tortious interference by the defendants. *See Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720, 728–29 (2d Cir.1992) (Under New York law doctrine of expectation damages, "aggrieved party [is placed] in the same economic position it would have been in had both parties [to a contract] fully performed.").

In ruling on defendants' pre-trial motion for partial summary judgment on the issue of damages, Judge Leisure noted that a plaintiff in a tortious interference with contract case is entitled to recover damages in the amount of his full pecuniary loss, and held that "plaintiffs may prove at trial damages related to the Friendship itself, including replacement cost and lost earnings from chartering and resale of the vessel." This ruling was correct. However, because there was no evidence presented at trial regarding the availability of a replacement vessel or the cost of the same, Judge Baer's charge should not have included "replacement value" language. Furthermore, even if plaintiffs had demonstrated that a replacement vessel was available and that they purchased it for more than the price agreed upon in the MOA for the purchase of the Brazilian Friendship, plaintiffs would not have been entitled to "damages for the replacement value" as charged by Judge Baer. Rather, they would have been entitled to damages for the difference between the cost of the replacement vessel and the purchase price set forth in the MOA.

In sum, the jury should have been charged that the appropriate measure of damages was the chartering profits, if any, that would have accrued to the Brazilian Friendship from the date plaintiffs were to have purchased it—or, more accurately, the date on which the required repairs to the vessel were

completed—until the date they would have sold it plus the profit, if any, that would have been realized upon resale of the vessel.

If, however, this were a case in which the evidence indicated that a replacement vessel had been purchased, it would have been appropriate for the district court to instruct the jury to award as damages the additional amount plaintiffs had to pay for a replacement vessel over and above the cost agreed upon in the MOA for the purchase of the Brazilian Friendship, plus the chartering profits (calculated at the rate earned by the Brazilian Friendship) they lost due to the delay in the purchase of a replacement beyond the date scheduled for purchase of the Brazilian Friendship. Because the market value of the replacement vessel takes into account expected future chartering revenues, it would constitute impermissible double recovery, as Judge Baer's charge suggests, to allow a jury to award damages both for the difference in cost of the Brazilian Friendship and the replacement vessel and for the chartering profits after the replacement. *See Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 826 (2d Cir.1990) ("Measuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation."), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991).

Finally, the determination of whether or not punitive or emotional distress damages are appropriate will have to be made on the basis of the facts presented on retrial. On the record before us, we note that it does not appear that damages of either type would be appropriate.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part and vacated in part. The case is remanded for a new trial to determine whether, in addition to AGR and Jaross (who previously were found liable and did not appeal) and Bomar (who previously was found liable and as to whom we affirm), Pappas and Burbank are liable for tortious interference, and to determine damages with respect to all defendants found liable.

This amended opinion was filed following plaintiffs' petition for rehearing, which is now moot.