COBB, Judge.
The body of Verbena High School English teacher and coach Michael Bernos was discovered in his home, sitting in a chair in front of his television on July 28, 1994. He had been shot 15 times, predominantly in the head and chest. Tony Orlando Quince was convicted of Bernos’s murder, a violation of § 13A-6-2, Ala.Code 1975; the murder was made a capital offense pursuant to § 13A-5-40(a)(2), Ala.Code 1975, because the murder was committed during the course of a robbery in the first degree. Quince was sentenced to life in prison without parole.
I.
Quince contends that the trial court erred in denying his motion to suppress his confession. Quince confessed to two undercover police officers who posed as Quince’s cellmates in the Chilton County jail. Quince argues that his incriminatory statements were obtained in violation of his right to due process, his privilege against self-incrimination, and his Sixth Amendment right to counsel. We disagree.
The following evidence was presented with respect to Quince’s motion to suppress. On March 11, 1995, Quince was arrested in Chil-ton County on drug charges unrelated to the present case. On March 25, 1995, in order to obtain information relating to the murder of Michael Bernos, two undercover officers— Robert Thornton of the Alabama Department of Investigation and Cedric Anderson of the Auburn Police Department — were placed in a jail cell with Quince in the Chilton County jail. (R.339) Quince engaged in conversation with Thornton and Anderson, who were posing as drug dealers. Quince told them that he was in jail on drug charges and that “they’re trying to say I shot this school teacher but I didn’t kill nobody.” (R.529, 572)
As their conversation continued, Thornton told Quince that their drug business brought in $6,000 per day, and that Quince should consider coming to work for them. (R.349) Thornton asked Quince if he could take care of his drug money if someone were “messing with it.” Quince said that he could because he was “all about money,” and said that he had killed a man named A1 Atkinson. (R.349) Quince told Thornton that he was going to look Thornton up when he got out of jail.
Thornton told Quince that if Quince was going to come to work for him, Quince needed to tell him anything that might possibly draw the attention of the police to'Quince. (R.351) Thornton then asked Quince about what Quince had said earlier about being *247 accused of killing a school teacher. Quince told Anderson to turn the volume up on the television in the cell.
Quince disclosed to Thornton and Anderson that Bernos was an English teacher who had owed him $2,500 for drugs. (R.353) Quince stated that he had gone to Bernos’s house and that Bernos had told him that he did not have the money. Quince said that he did not give Bernos another chance to pay his debt because he needed the money. Quince told Thornton and Anderson that he left Bernos’s house, but that he returned later with his gun and shot Bernos. (R.371) Quince admitted to Thornton and Anderson that he had shot Bernos in the head four times with a .45 caliber gun, and that he took Bernos’s wallet and checkbook and disposed of them near a church. (R.353) Quince also told the undercover officers that he broke down the gun that he had used and then threw it in the river. (R.353)
A.
Quince argues that his due process rights were violated by the manner in which the police secured these incriminatory statements. Quince concedes that, under Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the undercover officers were under no duty to advise him of his Miranda rights before he confessed to killing Bernos. Yet, Quince argues that “the State’s actions clearly established a pattern of conduct which establishes a due process denial.” (Appellant’s brief p. 3) We disagree.
In support of his argument, Quince merely cites Justice Brennan’s concurring opinion in Illinois v. Perkins, which states that “the deception and manipulation practiced on [Perkins] raise a substantial claim that the confession was obtained in violation of the Due Process Clause.” 496 U.S. at 301, 110 S.Ct. at 2399 (Brennan, J., concurring) (emphasis added). In that case, Perkins confessed to undercover officers who had been placed in a jail cell with him. Significantly, a majority of the Supreme Court disagreed with Justice Brennan’s view that extracting confessions by placing undercover officers in a jail cell raises serious concerns that the suspect’s will may be overborne. 496 U.S. at 302, 110 S.Ct. at 2400. Furthermore, even in light of his concerns, Justice Brennan concurred in holding that Perkins’s confession was voluntary.
We find that the conduct of the undercover officers in this case did not violate Quince’s due process rights. The evidence was undisputed that Quince was not beaten, nor was there any evidence of other forms of physical or psychological pressure in this case. See Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Contrary to Quince’s assertion, the fact that he was in custody does not mean that his conversation with undercover officers Thornton and Anderson was an ‘interrogation’ or that he was in a coercive environment. “The essential ingredients of a ‘police-dominated atmosphere’ and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.” Illinois v. Perkins, 496 U.S. at 296, 110 S.Ct. at 2397.
Quince believed that he was having a casual conversation with fellow drug dealers and he maintained a relaxed composure throughout the discussion that resulted in the confession. His due process rights were not violated.
B.
Quince also contends that his right against self-incrimination was violated because, he says, his confession was not voluntary. Specifically, Quince claims that his statement was both the product of an offer of a reward and the result of the older “inmates” talking about violence. A review of the record, however, reveals that at no point did the undercover officers threaten Quince or say anything to place Quince in fear for his safety. Nor did they make Quince any promises in order to compel him to confess to the murder.
Thornton did not tell Quince that Quince could work for him only if he had killed Bernos. In fact, Thornton told Quince that he was concerned that Quince might bring the “heat” down on them. Thus, denying involvement in Bernos’s murder was more likely to bring Quince into the undercover *248 officer’s “drug operation” than admitting to Bernos’s murder. We find Quince’s contention that Thornton induced Quince to make incriminatory statements by promising him a job to be without merit.
Additionally, there were no inherently compelling pressures on Quince to speak. Thornton testified that their conversation with Quince was “casual” and that Quince did not appear upset or afraid during the conversation. (R.344) He also testified that Quince appeared interested in joining their drug business. (R.346) Thornton also testified that Quince was relaxed when Thornton asked him if he could take care of Thornton’s drug money if someone were to mess with it. (R.347) Thornton testified that he did not coerce or threaten Quince in any way. (R.355) Thus, the record does not support Quince’s assertion that he was intimidated by Thornton and Anderson into making incriminating statements or that there was a threat of violence against Quince.
When a suspect has no reason to think that he is speaking to a government agent, it should not be assumed that the suspect might feel coerced. Illinois v. Perkins, 496 U.S. at 297, 110 S.Ct. at 2397. “[Detention, whether or not for the crime in question, does not warrant a presumption that the use of an undercover agent to speak with an incarcerated suspect makes any confession thus obtained involuntary.” 496 U.S. at 299, 110 S.Ct. at 2398. The record shows that Quince’s incriminatory statements were the product of Quince’s own free will, rather than any inducement or coercion by the undercover officers.
We give great weight to the trial court’s finding of voluntariness. Bryant v. State, 428 So.2d 641 (Ala.Cr.App.1982). Under the circumstances of this case, we agree with the trial court’s finding that Quince’s confession was voluntary. “The tactic employed here to elicit a voluntary confession from a suspect does not violate the self-incrimination clause.” 496 U.S. at 297, 110 S.Ct. at 2398; See also Hoffa v. U.S., 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).
C.
Quince also argues that the undercover officers violated his Sixth Amendment right to counsel because, he says, the police knew when the conversation took place that he had retained counsel on unrelated drug charges. However, Quince fails to present any evidence that he had retained counsel on those drug charges. In fact, Quince himself argues that his statement was induced by the undercover officers’s promising to help him get a lawyer if he came to work with them in their “drug business,” thus implying that he did not already have a lawyer. (Appellant’s brief, p. 4)
Once a suspect invokes the Fifth Amendment right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present. Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). However, Quince does not even raise as an issue the denial of his Fifth Amendment right to counsel. Instead, he argues that his Sixth Amendment right to counsel was violated.
The Sixth Amendment light to counsel is offense specific. Illinois v. Perkins, 496 U.S. at 299, 110 S.Ct. at 2398-99; McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). This right does not attach until the defendant is indicted or arraigned. Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). The Sixth Amendment right to counsel “cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced.” McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). The fact that the Sixth Amendment right to counsel has attached for one crime does not prevent police from initiating questioning related to other crimes. 501 U.S. at 175, 111 S.Ct. at 2207.
Quince was in jail on drug charges that were unrelated to the present case; he had not been charged with or arrested for Ber-nos’s murder when he confessed to committing the murder. Thus, Quince’s incriminating statements to Thornton and Anderson *249 concern a crime for which Quince had not yet been charged. Therefore, even if Quince had shown that he had retained counsel on the drug charges and even if formal proceedings had begun against him on the drug charges, the undercover officers did not violate Quince’s Sixth Amendment right to counsel when they conversed with Quince in his jail cell, because Quince’s Sixth Amendment right to counsel had not attached with respect to the murder charge. See Maine v. Moulton, 474 U.S. 159, 179-80, 106 S.Ct. 477, 488-89, 88 L.Ed.2d 481 (1985); Illinois v. Perkins, 496 U.S. at 299, 110 S.Ct. at 2398-99; McNeil v. Wisconsin, 501 U.S. 171, 175-76, 111 S.Ct. 2204, 2207-08, 115 L.Ed.2d 158 (1991).
This court must uphold a trial court’s ruling on a motion to suppress unless the ruling is clearly erroneous and palpably contrary to the great weight of the evidence. Ex parte McCary, 528 So.2d 1133 (Ala.1988); Ex parte Singleton, 465 So.2d 443 (Ala.1985). For the above-stated reasons, the trial court properly denied Quince’s motion to suppress his confession.
II.
Quince contends that the trial court erred in allowing Dr. James Lauridson of the Alabama Department of Forensic Sciences to testify as to the position of Bernos’s body at the time he was shot. Quince argues that Dr. Lauridson’s testimony was based solely on an examination of Bernos’s wounds and that it invaded the province of the jury. However, this issue is not properly before this Court because Quince failed to object before the trial court on the grounds he now asserts on appeal.
At trial, the State asked Dr. Laurid-son to give his “medical opinion as to the position Coach Bernos was in as he was being shot and the existence of one or two gunmen in delivering the wounds.” (R.300) Quince objected to Dr. Lauridson’s testimony, stating: “I don’t think its been shown — I certainly don’t have any questions about the doctor’s specialty in the field of forensic pathology, but I believe that we’re getting into the field of ballistics.” (R.300) Thus, Quince objected on the grounds that the question was outside of Dr. Lauridson’s field of expertise. The trial court overruled Quince’s objection on those same grounds, stating that whether there were two gunmen was out of Dr. Lauridson’s expertise, but that Dr. Lau-ridson could give an opinion as to the position of the victim’s body. Specific grounds of objection waive all others not specified. Moss v. State, 545 So.2d 230 (Ala.Cr.App.1989); Griffin v. State, 591 So.2d 547 (Ala.Cr.App.1991). Therefore, this issue was not preserved for our review.
Based on the foregoing, the trial court’s judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.