Filed 1/14/25  P. v. Smith CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES LEWIS SMITH,<br><br>Defendant and Appellant. | B331510<br><br>(Los Angeles County<br>Super. Ct. No. NA098545) |

APPEAL from an order of the Superior Court of Los Angeles County, Judith L. Meyer, Judge.  Reversed and remanded.

Jonathan Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant James Lewis Smith and his brother, David, got into a fistfight with two strangers they randomly encountered on the street. After getting knocked down during the fight, David drew a gun and fatally shot one of the strangers. A jury found David guilty of second degree murder, and appellant pled no contest to voluntary manslaughter. Appellant subsequently filed a petition for resentencing under Penal Code section 1172.6,[1] arguing that he could not be convicted under an aiding and abetting theory because there was no evidence he shared David's intent to kill. The trial court denied the petition after an evidentiary hearing, and appellant appealed.

Approximately one month later, the Supreme Court decided *People v. Reyes* (2023) 14 Cal.5th 981, 992 (*Reyes*), in which it clarified the key questions necessary to determine whether a petitioner aided and abetted a direct perpetrator of murder: Did the petitioner know the perpetrator intended to kill the victim? Did the petitioner intend to aid the killing? Did the petitioner know the shooting or other life-endangering act was dangerous to human life? And did the petitioner act in conscious disregard for human life? The trial court did not have the benefit of *Reyes* at the time of appellant's evidentiary hearing and does not appear to have considered these questions. Because we cannot know whether the trial court would have reached the same result under the correct standard, we reverse and remand for the trial court to conduct further proceedings consistent with this opinion.

---

[1] Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) All further undesignated statutory references are to the Penal Code.

2

# FACTUAL BACKGROUND

The following facts were adduced from evidence admitted at appellant's section 1172.6, subdivision (d)(3) hearing. That evidence consisted of transcripts of appellant's preliminary, plea, and sentencing hearings; a transcript of a recorded conversation appellant had with jail informants (the "*Perkins* operation"[2]); and a transcript of the interrogation of his cousin, Asia Otts.

Around 1:50 p.m. on February 21, 2014, M. Allen was walking down a Long Beach sidewalk with her friend Christopher Lane. Appellant and his brother David were walking the opposite direction and approached Lane and Allen. Appellant bumped into Allen and asked her, "Baby, what you doin' with him?" He also asked Allen and Lane where they were from, which Allen interpreted as gang banging Appellant told them, "This ain't no Hub City," which Allen took as a "disrespectful" reference to the Compton hat she was wearing. Allen and Lane said they did not gang bang and tried to walk away.

David said, "This is Babies. This is our city," which Allen understood as a reference to a local gang she knew as "Insane."[3] Appellant then insulted Allen and told her she was "out of pocket." Allen responded in kind. At some point, David and

---

[2] In *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), the United States Supreme Court held a criminal suspect who makes incriminating statements is not entitled to warnings under *Miranda v. Arizona* (1966) 384 U.S. 436 "when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Perkins*, at p. 294.)

[3] A gang expert testified at the preliminary hearing that "Baby Insane" was a prominent clique of the Insane Crips gang.

appellant asked Allen and Lane to go around the corner. Allen and Lane refused.

At that point, either appellant struck Allen, or she struck him; Allen said the former on direct examination and the latter on cross and to police. When David tried to intervene, Lane struck him, and the two men began fighting as well. After David and Lane exchanged some blows, Lane knocked David to the ground. Allen and appellant stopped fighting and "were just standing there looking shocked." Allen told Lane, "Let's go," and they started to walk away. David then got up, drew a gun, and fired three or four shots at Lane's back. Lane was struck and fell to the ground.

Allen knelt down next to Lane and began talking to him. David approached, put his revolver about a foot from Allen's face, and threatened to kill her. Lane said appellant "stood together" with David in Allen's "area," and "they didn't separate until [Lane] was laying on the ground and [David] put the gun in my face." Allen told David to go ahead, but he withdrew the gun. Allen then stood up to call 911 and Lane's mother, and David and appellant walked away, going in different directions. Allen estimated the entire encounter took "no more than two minutes." For purposes of the preliminary hearing, the parties stipulated that Lane died of multiple gunshot wounds.

After the shooting, appellant and David stayed in various hotels with their cousin, Asia Otts, who believed they had been involved with a robbery. Sometime later, appellant was arrested and placed in a jail cell with two government informants; his conversation with them was recorded.

During the conversation, appellant told the informants he was from "Babies" in Long Beach but he and his older brother

4

had been apprehended in Los Angeles for "hood shit." Appellant said "the shit happened" when Lane and Allen started it. When asked if he and David had been "on a gang banging trip," appellant said "[l]ow-ball" and "we was cool," but Lane, who was from Compton, had been tripping. Appellant claimed that he had thrown punches at Lane and denied fighting Allen. He further acknowledged that David shot Lane in the back, and said he had been "about 5 feet," or "5 or 10 feet" away at the time. When one of the informants asked appellant if he had burned the clothes he had been wearing, appellant said "Uh-huh." He also acknowledged a role in disposing of the gun. When asked if he had been "running" before his apprehension, appellant said his cousin "had the hotel." One of the informants advised appellant to talk to David and "come up with . . . a story," such as "'I didn't know shit. I was just - - yes, I was there[, a]nd shit like that, you know, if your brother is okay with it." Appellant responded, "Uh-huh."

## PROCEDURAL HISTORY

### I. Conviction

A felony complaint filed March 11, 2014 charged appellant and David with the murder of Lane (§ 187, subd. (a), count 1) and the assault of Allen with a firearm (§ 245, subd. (a)(2), count 2). The complaint included gang (§ 186.22, subd. (b)(1)(C)) and principal use firearm allegations (§ 12022.53, subds. (d), (e)(1)) against both appellant and David, and personal use firearm allegations against David only (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d)). The preliminary hearing at which Allen gave the above testimony was held on December 23, 2014. The trial court held both appellant and David to answer.

5

On April 5, 2017, appellant and the People agreed to a plea deal. Under the terms of the agreement, the People added a charge of voluntary manslaughter to the information (§ 192, subd. (a), count 3). Appellant pled no contest to all three charges and applicable enhancements, with the proviso that sentencing would be put over until the conclusion of David's trial. If appellant refrained from committing any crimes that affected the case and testified truthfully if called at trial, the People would dismiss all charges and allegations except the interlineated voluntary manslaughter charge, on which appellant would receive a midterm sentence of six years.

David proceeded to trial, at which a jury found him guilty of second degree murder and assault and found the enhancements true. On May 8, 2017, in accordance with the plea agreement, the People dismissed the murder and assault charges and enhancement allegations and the trial court sentenced appellant to the midterm of six years for voluntary manslaughter. The trial court also ordered appellant to pay restitution, for which he was jointly and severally liable with David.

## II. Section 1172.6 Proceedings

On January 12, 2022, appellant filed a section 1172.6 petition for resentencing. The trial court appointed counsel for him and ordered the People to respond to the petition.

On February 28, 2022, the People filed an opposition arguing that appellant was ineligible for relief because "[n]either natural and probable consequences nor felony murder were applicable theories of liability to this case." Citing the appellate opinion affirming David's convictions on direct appeal, *People v. Smith* (Jan. 8, 2019, B283278) [nonpub. opn.], which stated that

6

appellant's statements to the informants "exposed him to possible aider and abettor liability," the People argued that appellant could still be found guilty as an aider and abettor.

On May 16, 2022, appellant filed a reply asserting that the "theory throughout the prosecution of the case was on the contrary a Natural and Probable Consequences Theory." He argued that there "was a lack of evidence to support that James Smith had knowledge of the gun David Smith possessed prior to the shooting, but even further there was a lack of evidence to support that James Smith had the requisite intent to aid and abet the shooting in that he did anything to 'aid, facilitate, promote, encourage, or instigate the commission of the crime,' which would have been required to successfully prosecute under an aiding and abetting theory."

On August 4, 2022, the trial court found a prima facie case for resentencing and issued an order to show cause. The People subsequently filed an additional opposition, arguing that evidence from the record of conviction proved beyond a reasonable doubt that appellant directly aided and abetted Lane's murder and was guilty of first or second degree murder. The People specifically pointed to the following, with all punctuation variations in original: "1) Petitioner James Smith initiated the confrontation with the victims 2) Petitioner James Smith Escalated [*sic*] the confrontation with the victims 3) petitioner attempted to continue the altercation on a street with less visibility 4) Petitioner got into a physical fight with [ ] Allen ; 4) [*sic*] Petitioner fighting with Allen gave David Smith an opportunity to fight with Victim Lane; 5) when the fight ended petitioner James Smith remained with his brother and fellow gang member. 6) petitioner stood next to David Smith as David

7

Smith shot Lane in the back. Petitioner did not flee. 7) Petitioner stood by as David assaulted and threatened Allen Petitioner [*sic*] did not flee. 8) Petitioner casually walked away with David. 9) Petitioner got rid of the gun 10) Petitioner got rid of the clothing he was wearing at the time 11) Petitioner hid in hotels after the murder[.]"

The People further argued that appellant was "guilty of a second degree, implied malice murder as a direct aider and abettor." Citing the same evidence, the People argued that appellant "facilitated this shooting of Lane by claiming their gang keeping [*sic*] Allen engaged during the physical fight. His statements claiming babies [*sic*] and Insane compelled David to kill. His presence at the crime scene reassured David conduct [*sic*]. Through his conduct, Petitioner Smith demonstrated his conscious disregard for Lane's life. After the victim was shot numerous times, Petitioner Smith casually and callously walked away with his brother. Petitioner Smith's actions demonstrated malice aforethought, implied malice, as required by the newly amended section 188." Appellant did not submit any additional filings.

On May 30, 2023, the trial court held an evidentiary hearing. The court sustained appellant's objections to the admission of the jury instructions and sentencing hearing transcript from David's trial and the appellate opinion affirming David's convictions. It admitted into evidence appellant's preliminary hearing transcript, the plea hearing transcript, the recordings and transcript of the *Perkins* operation, and the recording and transcript of Otts's police interview. Neither side called any witnesses or presented other evidence.

In addition to relying on their written arguments, the People asserted that the petition should be denied because appellant's initial no contest plea to the murder and joint and several responsibility for restitution showed that "the theory of the disposition was for aiding and abetting." Appellant's counsel repeatedly contended there was no evidence that appellant shared David's intent to kill Lane, "which is required for an aiding and abetting theory." Appellant's counsel characterized the facts as "a classic natural and probable consequences scenario," and emphasized that appellant was not fighting at the time the shots were fired.

In reply, the People characterized the facts as "a classic gang confrontation" and asserted that appellant's comments to the informants about "low-ball gang banging" showed that appellant knew that David "was prepared to end that confrontation and was armed." The People also asserted that appellant tried to get Lane and Allen to go around the corner because he "wanted less witnesses to what was about to happen," and was "there for support" as the fight ended and David threatened Allen. They also pointed to appellant's disposal of the gun and his clothes as evidence that he aided and abetted. Appellant's counsel responded that the post-shooting conduct was "tantamount to accessory-after-the-fact behavior" and did little to demonstrate appellant's intent at the relevant time. She further reiterated her contention that the People were making "the exact argument you make in a natural and probable consequences argument." The court took the matter under submission.

In a written ruling filed later the same day, the court denied the petition. After listing the evidence and written arguments it had considered, the court made the following ruling:

9

"The court finds beyond a reasonable doubt the guilt of James Lewis Smith. The court basis [*sic*] this ruling upon evidence presented and admitted at the hearing. Specifically, the court re-reviewed the Perkins Operation DVD and transcript. The court found that as compelling evidence to Mr. James Lewis Smith [*sic*] specific intent towards guilt in this case. In addition, specifically in the PH [preliminary hearing] transcript, on page 69, line 27-28, through page 70, lines 1-10, the court finds that testimony relevant as to whether Mr. James Lewis Smith harbored a specific intent beyond a reasonable doubt to satisfy guilt in this case. Ultimately, based upon the entire record of this hearing, this court is satisfied beyond a reasonable doubt as to Mr. James Lewis Smith's guilty [*sic*] in this case."[4] Appellant timely appealed.

## DISCUSSION

While appellant's appeal was pending, the Supreme Court decided *Reyes*, *supra*, 14 Cal.5th 981. In *Reyes*, defendant Reyes was with a group of fellow gang members, one of whom he knew had a gun. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) Reyes and the group rode their bicycles to an area on the edge of a rival gang's

---

[4] The cited portion of the preliminary hearing transcript contains Allen's re-cross-examination testimony about what happened after David fired at Lane: "Q. And once the shots went off, [appellant] walked down the street; correct? A. Not right at – they stood together, they didn't separate until [Lane] was laying on the ground and this young guy right here put the gun in my face. Q. But [appellant] was walking down the street at that point? A. No, he was not. He was still in that area as this young guy put a gun in my face. Q. He wasn't standing next to you, though? A. They both were in my area as I was laying on the ground, a gun in my face."

10

territory, where they chased after a car. The gang member with the gun, Lopez, fired a single shot at the driver of the car. The shot struck the driver in the head and killed him. (*Ibid.*) Later in the day, Reyes held the murder weapon to another victim's head while he and several others assaulted the victim. (*Ibid.*)

Reyes was charged with murder. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) At his trial, the People conceded Reyes was not the shooter and argued that Reyes was guilty under the natural and probable consequences theory or "directly aided and abetted the murder by 'backing up fellow gang members' during the killing." (*Ibid.*) Notably, "[t]here was no evidence that Reyes had expressly agreed to serve as backup while Lopez committed the murder. The prosecutor argued that there was no need to show an express agreement because the jury could 'infer from the surrounding facts' that Reyes was acting as backup." (*Id.* at p. 986.) Specifically, the prosecutor "pointed to Reyes's 'presence' at the time of the shooting and earlier in the park when Lopez showed the gun to others; his 'companionship' with Lopez . . .; his 'flight from the scene' after the killing; and the fact that Reyes subsequently possessed the murder weapon and used it during a separate assault later that day." (*Ibid.*) The jury found Reyes guilty of second degree murder, street terrorism, and related gang and firearm enhancements. (*Ibid.*)

Reyes later filed a petition for resentencing under section 1172.6, arguing that he was convicted under the now-invalid natural and probable consequences theory. (*Reyes*, *supra*, 14 Cal.5th at p. 986.) The matter proceeded to an evidentiary hearing, at which Reyes's counsel argued there was no evidence that Reyes committed any act that helped, encouraged, or facilitated the fatal shooting. (*Id.* at pp. 986-987.) The trial court

11

denied the petition, finding that "'the act in this case is the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory,' that the natural and probable consequence of their doing so was dangerous to human life, that Reyes was aware the act was dangerous to human life, and that he deliberately acted with conscious disregard for that danger." (*Id.* at p. 987.) The Court of Appeal affirmed. (*Ibid.*) The Supreme Court granted review and reversed.

Applying the de novo standard of review because there was "an issue as to whether the court misunderstood the elements of the applicable offense," the Supreme Court concluded the trial court "misapprehended what is required as a matter of law to prove aiding and abetting implied malice murder." (*Reyes*, *supra*, 14 Cal.5th at p. 988.) The court explained that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[ ] a high degree of probability that it will result in death.""" (*Id.* at p. 989.) The court noted that Reyes accompanied an armed gang member to an area near rival territory, and "[i]t may have been likely that this act would result in some sort of gang confrontation, and it is possible that someone would get hurt or killed." (*Ibid.*) However, the court held that "the act does not by itself give rise to a high degree of probability that death will result." (*Ibid.*) The court further held that "'to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the

12

perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Id.* at p. 991, emphases in original.)

Thus, it held that, "assuming the life-endangering act was the shooting, the trial court should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes*, *supra*, 14 Cal.5th at p. 992.) Because it was unclear whether the trial court would reach the same result under the correct standard, the Supreme Court remanded the matter for "proper application of the elements of implied malice murder on a direct aiding and abetting theory." (*Ibid.*)

Appellant contends that *Reyes* is factually and legally analogous, and, under its holding, "it is apparent that the evidence was not sufficient to sustain a finding that appellant aided and abetted the shooting of the victim." He acknowledges that "there was always the possibility" that the spontaneous encounter he and David had with Lane and Allen on the sidewalk "could escalate into violence," but argues that "nothing about the circumstances leading up to the shooting created a substantial likelihood or reasonable expectation that *fatal* violence would be the outcome." He requests that we reverse outright or remand "for a new evidentiary hearing and a proper application of the elements of implied malice murder on a direct aiding and abetting theory."

The Attorney General responds that substantial evidence supports the trial court's finding that appellant directly aided and abetted either an express or implied malice murder. Respondent argues that appellant's reliance on *Reyes* "is not well

13

taken" because "appellant's actions did more than create the possibility of a fatal outcome."  Respondent asserts that "the evidence here showed that appellant admitted to an informant he was 'gang banging' with David, instigated and escalated the gang fight, did nothing to indicate surprise when David took out the gun, joined in threatening the surviving victim, and concealed evidence of the crime afterwards."  Respondent contends the case is more analogous to *People v. Vargas* (2022) 84 Cal.App.5th 943 (*Vargas*), an appellate court decision that pre-dates *Reyes*.

We first consider whether the trial court applied the correct standard in determining whether appellant could be guilty under a direct aiding and abetting theory.  This is a legal question that we review independently.  (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

We agree with appellant that *Reyes* delineates the applicable legal requirements of direct aiding and abetting implied malice murder.  Even if *Vargas* is more factually analogous, which we do not decide here, it pre-dates *Reyes*, which is binding on this court.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  To the extent the trial court may have found appellant guilty of directly aiding and abetting an express malice murder, the standard is largely the same: a defendant must have "not only an intent to kill but knowledge and intent regarding the direct perpetrator's homicidal or life-endangering acts."  (*People v. Curiel* (2023) 15 Cal.5th 433, 469 (*Curiel*); see also *id.* at p. 463 [noting similarity of standards and citing *Reyes*].)  "Intent to kill itself does not establish a sufficient mens rea regarding a murder or life-endangering conduct that the aider and abettor has no intent to aid or encourage — and that the aider and abettor does not even subjectively know will occur."  (*Id.* at p. 470.)

14

Both *Reyes* and *Curiel* were decided after the trial court made its ruling in this case. The court accordingly did not have the benefit of either decision when considering whether the People proved appellant's guilt beyond a reasonable doubt. We presume the court understood and applied the correct legal standard (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114), but the applicable standards in the section 1172.6 context have evolved rapidly and were further refined after the court made its ruling.

Although the court displayed great care in its evaluation of the evidence presented at the hearing, it does not appear to have considered the pertinent questions set forth in the superseding and controlling authorities of *Reyes* and *Curiel*: "whether [appellant] knew that [David] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes*, *supra*, 14 Cal.5th at p. 992.) Instead, it primarily emphasized whether appellant "harbored a specific intent." As *Curiel* teaches, such intent is not dispositive in the context of aiding and abetting liability. We accordingly conclude the court erred.

Because the court did not have the opportunity to evaluate the facts under the correct standards for aiding and abetting liability, we remand the matter to the trial court for further proceedings consistent with this opinion and any additional developments in section 1172.6 jurisprudence. On remand, the parties may address appellant's age and maturity level at the time of the crime.

## DISPOSITION

The order denying appellant's section 1172.6 petition is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


MORI, J.