Filed 5/27/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084475 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE414568) |
| OBAIDA SAAD RAMADHAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge. Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Obaida Saad Ramadhan of second degree murder (Pen. Code, § 187, subd. (a)) and found true that he personally used and discharged a firearm, proximately causing great bodily injury and death, in the commission of the crime (§§ 12022.5(a), 12022.53(d)). Ramadhan was sentenced to a total prison term of 20 years plus 15 years to life.

Ramadhan contends this court must reverse the judgment because the trial court prejudicially erred when it admitted statements Ramadhan made

after invoking his right to counsel in the middle of an ongoing *Perkins* operation—a law enforcement tactic in which an undercover agent is placed in a jail cell with a suspect to elicit incriminating statements. (See *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) In our view, however, Ramadhan reads our recent decision in *People v. Zapata* (2026) 118 Cal.App.5th 529 (*Zapata*) too broadly. Distilled to its essence, *Zapata* prohibits participation in a *Perkins* operation by known law enforcement officers *after* a defendant has invoked the *Miranda* right to counsel. Distinguishing *Zapata* from the facts of this case, we disagree with Ramadhan and, accordingly, affirm.

## I.

### A.

One evening in August 2022, Jasiah White was hanging out in a parking lot with his brother, several friends, and others, drinking alcohol and smoking. Later, "a Caucasian male" with a beard, whom White's brother identified as Ramadhan, joined them. Ramadhan wore a gray hoodie with the hood up and his hands in the front pocket. White's brother thought Ramadhan had a gun.

One of White's friends heard gunshots, ran in their direction, and saw White holding his stomach. White told his friend he had been shot, told him the shooter had run off, and collapsed. White died of gunshot wounds of the torso.

Someone who lived across from the parking lot heard gunshots, looked out the window, and saw someone wearing a hoodie over their head running away. Another person heard gunshots and recorded a video of someone in a gray hoodie running past.

At the scene, the police recovered five 9mm casings all fired from the same firearm in the area of the shooting. Swabs taken from the casings

2

contained insufficient DNA to complete testing, and no latent fingerprints were recovered.  No firearm was found.

The day after the shooting, a social media post circulated depicting Ramadhan with a caption saying, "heard it was him."  One of White's friends believed Ramadhan was the shooter because he was not there after the shooting and because Ramadhan and White had gotten into an argument several days before the incident.

Ramadhan was eventually arrested on gun charges and taken to a holding cell, where the *Perkins* operation took place.

B.

Ramadhan, who at the time was 18 years old, about five feet seven inches tall, and 116 pounds, was placed in a cell with an older and larger law enforcement agent.  The agent told Ramadhan he had just finished time in prison for a homicide and was being held for a double homicide.  Ramadhan said he was there on "felony gun charges" but "[t]hey're investigating a homicide."

About 15 minutes into the operation, a law enforcement officer came into the cell to swab Ramadhan's cheek for DNA.  Then a homicide detective with whom Ramadhan had prior interactions entered the cell and announced Ramadhan was "going to be charged with Jasiah White's murder."  The detective listed off alleged evidence law enforcement had against Ramadhan, including "surveillance footage of the entire incident," "multiple witnesses that identify [Ramadhan] as the shooter," "multiple shell casings that were collected at the scene [that] will be compared to [Ramadhan's] DNA," cell phone data that "puts [Ramadhan] at the scene," and White's "dying declaration . . . that [Ramadhan] shot him."  Addressing Ramadhan, the detective then said, "This is your opportunity to be straight up."  She told

3

Ramadhan that once her partner arrived, "we will talk to you in a separate room."

At that point, Ramadhan twice said, "I'd like a lawyer."

As soon as the detective left and the cell door closed, the agent said, "You're not going nowhere now. This would be at least two to three years fighting it." Ramadhan asked for advice. After speaking about prison for a few minutes, the agent told Ramadhan that "[t]he casings are gonna fuck you" and "[t]he video[']s gonna hurt you," at which point Ramadhan began disclosing incriminating information, like how he wiped the casings with baby wipes ahead of time. The agent then began asking questions to elicit incriminating responses, like "what did you do [with the gun]?" and "[did y]ou get rid of the those clothes you had on?" In response, Ramadhan made further self-incriminating statements.

## C.

At trial, a psychologist testified that, given his background, Ramadhan would be "susceptible" to interrogation by "a father figure."

Ramadhan testified on his own behalf. According to him, the night before the shooting, White took Ramadhan's unloaded gun, angrily told him to "watch out," and pulled the trigger while pointing the gun at Ramadhan. At some point the next evening, when everyone was hanging out, White asked Ramadhan to talk away from the group. White mentioned he was in a gang and said if Ramadhan was "trip[p]in," they could fight. White began to reach for what Ramadhan thought was a gun in his waistband. Ramadhan took out his gun and shot at White before running away.

## II.

Ramadhan contends the trial court erred in admitting the statements he made during the *Perkins* operation after he requested a lawyer.

4

Independently reviewing whether the challenged statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), we disagree. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

The Fifth Amendment privilege against self-incrimination precludes use at trial of statements obtained from custodial interrogation of a suspect unless the suspect knowingly and voluntarily waived the suspect's rights under *Miranda. Perkins*, however, concluded a suspect's statements to an undercover agent are admissible notwithstanding the failure to advise the suspect of *Miranda* rights beforehand. (*Perkins*, *supra*, 496 U.S. at p. 294.) *Perkins* reasoned that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom [the incarcerated person] believes to be a fellow inmate." (*Perkins*, at p. 296.)

Historically, California courts have found *Perkins* controls when a suspect invokes the right to counsel but then unknowingly speaks to a police agent the suspect does not believe to be an agent.[1] (See, e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 758; *People v. Orozco* (2019) 32 Cal.App.5th 802, 815.)

Our recent decision in *Zapata* marked a departure from prior precedent. There, the defendant was a suspected murderer. (*Zapata*, *supra*, 118 Cal.App.5th at p. 533.) While in custody for unrelated charges, he was

---

[1]  The Supreme Court has granted review in *People v. Allen* (July 22, 2024, B328333) [nonpub. opn.], review granted Nov. 20, 2024, S286520, to consider the admissibility of a defendant's statements to a *Perkins* operative obtained after the defendant invokes the Fifth Amendment right to remain silent.

placed in a holding cell with two law enforcement agents posing as inmates. (*Ibid.*) An officer recorded and monitored the operation, "contacting" the defendant "approximately three times in order to 'stimulat[e]' conversation between [the defendant] and the agents." (*Ibid.*) When the agents asked about the murder, the defendant initially denied any involvement. (*Id.* at p. 534.) But about halfway into the hours-long operation, the officer removed the defendant from the cell for a fake lineup, during which he was allegedly identified as the killer. (*Ibid.*) The officer asked the defendant if he wanted to talk, but the defendant requested to speak to a lawyer. (*Ibid.*) The officer returned the defendant to the cell and, directly in front of the agents posing as inmates, said he was charging the defendant with murder. (*Ibid.*) After the officer left, the agents immediately began asking the defendant about the murder, and he ultimately admitted it. (*Ibid.*) The trial court denied the defendant's motion to exclude these statements, the statements were played at trial, and the defendant was convicted of second degree murder. (*Id.* at pp. 535, 537.)

*Zapata* distinguished actions by disguised *Perkins* operatives taken after a defendant invokes *Miranda* rights—which *Perkins* holds do not violate *Miranda*—from "stimulating" conduct by persons known by the defendant to be law enforcement officers. After making this distinction, *Zapata* concluded the trial court erred in denying the motion to suppress because the known law enforcement officer's stimulation of the conversation between the defendant and the agents *after* the defendant invoked his *Miranda* rights amounted to a custodial interrogation in violation of *Miranda* and *Rhode Island v. Innis* (1980) 446 U.S. 291, 299, 301. (*Zapata, supra,* 118 Cal.App.5th at pp. 540-541.)

6

Relying on *Perkins*, *Zapata* noted that "ploys which rise to the level of compulsion or coercion *remain* within *Miranda*'s ambit." (*Zapata, supra*, 118 Cal.App.5th at p. 540.) In *Zapata*, while monitoring the *Perkins* operation, the known officer "contacted" the defendant "[s]everal times" "as stimulations" "to get him to talk." (*Zapata*, at p. 540.) "After an hour the cooperating inmates were not getting information about the murder." (*Ibid*.) "At that point," the known officer orchestrated the fake lineup "to increase the 'level of compulsion' [citation] on [the defendant] and to coerce him to speak about the killing[] when he got back to his cell." (*Ibid*.) "Then, *even after [the defendant] expressly requested an attorney*, the deputy increased pressure on [the defendant] by not only putting him back into the cell, but also simultaneously stating that he would be charged with murder," "prompt[ing] the *Perkins* operatives to ask [the defendant] about that crime." (*Zapata*, at pp. 540-541, italics added.) Because the operation "relied on significant participation of a person *known by [the defendant] to be law enforcement* while [the defendant] was in police custody," and after the defendant had invoked his *Miranda* right to an attorney, "[t]his situation cannot be fairly characterized as an environment free of a " ' "police-dominated atmosphere." ' " (*Zapata*, at p. 541, italics added.) Rather, by continuing to participate after the defendant asked for a lawyer, the known officer furthered a police-initiated custodial interrogation prohibited under *Edwards v. Arizona* (1981) 451 U.S. 477, "rendering [the defendant's] statements inadmissible." (*Zapata*, at p. 541.)

The critical factor is the *timing* of the known officer's participation in the ruse relative to the invocation of the right to counsel. In *Zapata*, the defendant invoked his right to counsel after the fake lineup. Rather than provide the defendant with counsel, the known officer instead took him back

7

to the cell occupied by the law enforcement agents and announced the murder charges in front of the agents, thus stimulating a conversation the officer expected would lead to damaging admissions. Here, on the other hand, the detective announced the murder charge and the alleged evidence supporting it in front of the law enforcement agent *before* Ramadhan invoked his right to counsel. The police conduct at issue here is therefore different in kind. After Ramadhan requested a lawyer, the known officer did nothing to stimulate conversations with the *Perkins* operative. Instead, the officer closed the cell door and allowed events to take their course. While the post-invocation conduct of the known officer in *Zapata* resulted in a coercive and police-dominated atmosphere that elevated the defendant's experience into a custodial interrogation, the same is not true here. Ramadhan entirely overlooks this significant distinguishing fact.

Ramadhan argues the disguised *Perkins* agent "asked pointed questions designed to get Ramadhan to discuss details of the shooting and to elicit incriminating responses." But this argument is misdirected. *Zapata* makes clear the crucial inquiry is not aimed at the disguised *Perkins* agent. Instead, the focus is on what the known law enforcement officer did to stimulate further conversation *after* a defendant invoked the *Miranda* right to counsel. (*Zapata, supra,* 118 Cal.App.5th at p. 539, fn. 7 ["our holding is limited to a post-*Miranda* invocation *Perkins* operation where stimulations from a known police officer amount to custodial interrogation"].) Here, once Ramadhan requested a lawyer, the known officers did nothing to elicit any damaging admissions. *Zapata* is simply inapplicable.

### III.

We affirm.

8

CASTILLO, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.